**Q.M., a Child Under Eighteen, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee**

**2013–SC–000210–DG**

Supreme Court of Kentucky.

RENDERED: MAY 14, 2015

Renee Sara Vandenwallbake, Assistant Public Advocate, Department of Public Advocacy, 100 Fair Oaks Lane, Suite 302, Frankfort, Kentucky 40601, for Appellant.

Jack Conway, Attorney General, Patricia Lynn Pryor, Commonwealth Attorney, Courthouse Annex, 2nd Floor, 511 South Main Street, Hopkinsville, Kentucky 42240, Jeanne Deborah Anderson, Assistant Attorney General, Office of the Attorney General, Office of Criminal Appeals, 1024 Capital Center Drive, Frankfort, Kentucky 40601–8204, for Appellee.

## OPINION OF THE COURT BY JUSTICE NOBLE

The policy and processes that make up the juvenile justice system, laid out in Kentucky in the Unified Juvenile Code, have received a great deal of attention on a national level over the last few years once it became widely known that millions of dollars were being spent to incarcerate juvenile offenders indiscriminately, to remove many from their homes for minor offenses, and to do this with very little due process. Anne S. Tiegen, Nat'l Conf. of State Legis., *Legislative Reforms in Juvenile Detention and the Justice System* 7 (2015).[1] Juvenile courts, charged with determining the best interests of the juvenile defendants before them, often faced complicated family issues and lacked training about the specifics of juvenile growth and development. There were limited remedies available to deal with an ever-increasing number of children being brought into court.

Kentucky has been at the forefront of this national debate, as is evidenced by sweeping changes to the existing juvenile code relating to status and public offenses through a legislative enactment commonly referred to as Senate Bill 200. *See* 2014 Ky. Laws Ch. 132 (SB 200). This legislation resulted from recognition of escalating budgetary demands for the existing juvenile offense system without a commensurate increase in successful outcomes. Legislative leaders formed a task force that met for two years, studying the existing processes, current research about how best to aid children with the problems that brought them into the system, and the financial impact of juvenile treatment. The report from the task force was the catalyst that led to the passage of Senate Bill 200, part of which took effect in 2014, with the rest to go into effect July 1, 2015.

This case, however, arises under the version of the statutes in effect prior to the amendments of 2014–2015.[2] Because this case concerns a juvenile code process known as an "informal adjustment," which is a concept carried over to the newly revised code, albeit with changes, and because the facts of this case raise questions about the validity of the process as applied, this court granted discretionary review to determine the scope of a juvenile court's authority in issuing and monitoring an informal adjustment. Additionally, this Court seeks to clarify the rights of a child subject to this process.

## I. Background

On April 13, 2011, "Jon,"[3] the then fifteen-year-old Appellant, was in class late in the day. For whatever reason, he pulled his penis out of his pants, put it on

1. This document can be accessed at the National Conference of State Legislatures' website, at http://www.ncsl.org/documents/cj/juvenile-detention-legislative-reforms.pdf.

2. Unless otherwise noted, the citation to and quotation of portions of the juvenile code are to those provisions in effect in 2011–2012, when the underlying proceedings were held.

It should also be noted that the revisions to the juvenile code enacted through SB 200 address several of the issues addressed in this opinion.

3. This name is a pseudonym, used to maintain the juvenile's anonymity and improve readability over the earlier practice of using initials.

the shoulder of the student in front of him, and tried to stick it in the student's ear and hit him in the face with it. This obviously caused a disturbance, and a juvenile complaint was filed two days later. This was converted to a petition charging Jon with third-degree sexual abuse. Then, on April 19, 2011, Jon was arrested and brought before the district court, where he was detained. At the next court date, Jon was represented by Jason Holland, a conflict attorney for the juvenile division of the Department of Public Advocacy (DPA), because the locally assigned DPA juvenile defender was conflicted out due to representing the complaining witness. Jon was released from detention on a conditional order of release.

During this time, Jon also had a pending juvenile offense case on a charge of assault that had occurred during a domestic violence incident between his mother and her ex-boyfriend.

Then, on May 24, 2011, during a pretrial conference, the district judge ordered that Jon's case be "informally adjusted" on the condition that he move out of the state of Kentucky to Oklahoma to live with his father, and the existing order of release with its conditions was terminated. That is the extent of the order, which was handwritten on a court docket sheet. Notably, the order does not state any other condition, including a time frame, or the parameters of what it meant to "live with" his father. As the record later indicated, Jon's father had another family in Oklahoma.

Jon and his mother (who was his legal custodian) were forced to comply with the order to avoid formal juvenile prosecution, and did so. Jon moved to Oklahoma, apparently enrolled in school there, and remained for around five months. He then returned to his mother in Kentucky.

In October, when the Commonwealth learned that Jon was back in Kentucky, his case was placed on the docket for "review." No written motion was filed, but the Commonwealth orally moved the district court to redocket the case and reinstate the sex offense charge, because Jon was back in Kentucky.

Jon and his mother appeared, but his previously appointed attorney (Jason Holland) had not been given notice and thus did not appear. The local DPA juvenile defender, who was conflicted out of representing Jon because she actively represented the complaining witness, nonetheless "stood in" as counsel for Jon.

The district court heard nothing beyond the Commonwealth's allegations that Jon had returned to Kentucky in violation of the court's previous order before ruling. No testimony was taken to establish that Jon had willfully violated the terms of the informal adjustment, and no arguments were made about the limitations of the informal adjustment, and whether there was a violation at all. In fact, Jon was effectively without counsel at this point, because the attorney "standing in" was conflicted out from making substantive arguments on his behalf. The district court sustained the motion to re-docket charges "as he did not stay in Oklahoma with dad." Jon was released on "strict" conditions of release and ordered to appear the following week for a pretrial conference, of which Jason Holland was to be notified.

After the court ruled on this motion, there was some discussion between the DPA lawyer and Jon's mother about where to go to find Jason Holland's office. In response to the DPA lawyer, Jon's mother attempted to explain that Jon was back in Kentucky for several reasons: he was unhappy away from her and his home, he felt his father favored his step-children, and most importantly, a dependency, neglect

and abuse case may have been initiated against the father in Oklahoma, which put Jon at risk. As the child's legal custodian, the mother wanted him out of harm's way. During the conversation, a male voice, possibly that of the prosecutor,[4] can be heard saying, "He's supposed to stay there [Oklahoma] for these charges to go away." In response to Jon's mother's explanation, the male voice can be heard saying: "Okay. That's fine. But these charges have to come back."

The record is not clear, but it appears that the prosecutor believed the Kentucky Children's Law Center had been consulted about representing Jon. At an appearance on December 15, 2011, the prosecutor stated that he had received a call from an "agency" that he had been told the week before would be representing Jon. He said that that unnamed agency said that they do not do criminal cases and thus it was his understanding that Jon was not represented at that time. He then noted that Jon needed to find out whether he was going to get a private attorney or have another DPA-conflict attorney appointed. Jon's mother said she would hire a private attorney. The judge ordered that they appear on December 22 with an attorney. The written order refers to the Kentucky Children's Law Center, noting that it does not represent children in juvenile court.

There is no recording of the December 22 appearance in the record. A written order, however, states that on that date, Jason Holland was reappointed as conflict counsel, and that the matter was scheduled for a pretrial conference on January 10, 2012.

The recording of the January 10, 2012 appearance is very short. Rather than a pretrial conference, it appears to have been transformed into an adjudication hearing at which Jon entered an "admission" on the sex-abuse charge as part of an agreement with the prosecution. The pending assault case was nearly two years old by that time, and it was to be dismissed as part of that agreement. The judge called the case, briefly described the deal (in no more than two sentences), and then undertook a very short colloquy on the "admission." The colloquy consisted of four questions: 1) Are you "admitting that you committed sexual abuse third degree?" 2) "Has anyone made a threat or promises to you to make you make this admission?" 3) "Are you under the influence of drugs or alcohol today?" and 4) "Are you entering this admission voluntarily and of your own free will?" No information was given that as a juvenile sexual offender, Jon could remain in sexual-offender treatment for up to four years, well past his eighteenth birthday, pursuant to KRS 635.515.

Though Jason Holland had previously been re-appointed to represent Jon, the record does not show whether he attended the January 10 hearing. The only voices that can be heard on the recording are those of the judge, the prosecutor, and Jon.

After asking Jon those four questions, the judge stated quickly: "Show admission made, waived rights." He then set the case for a disposition hearing on January 31, 2012, ordered the Department of Juvenile Justice (DJJ) to prepare a pre-disposi-

**4.** 4 In light of when this conversation took place (after the judge's ruling), the male voice was possibly that of the prosecutor, but it is impossible to conclusively discern based on the record, which consists only of an audio tape. The quality of the recording is low and the voices are distorted, which makes it difficult to discern who is speaking to whom. Thus, it is not completely clear whether Jon's mother was speaking to the court or the prosecutor as she tried to explain the situation.

tion report, and again left Jon on "strict" conditions of release.

It appears that the January 31 hearing did not happen. Instead, the matter was continued, several times, until March 27, 2012. At that time, Jon appeared with his mother. The prosecutor opened by stating that Jason Holland had been appointed to represent Jon, but that he and his mother had contacted Holland about hiring a specific private attorney. In response to this the judge said, "I guess my question is: for what purpose? If you think I'm going to allow him to withdraw his admission, I am not. And the disposition is probably going to be what is being recommended right now. But if you want a week to get an attorney over to the dispositional hearing, I'll be glad to give it to you, but one week only." He then ordered that Jon appear the next week with a lawyer for his disposition hearing.

At that next appearance, the judge ordered the matter continued to April 17. The court's order stated that this was to be the *"last* continuance."

At the April 17 hearing, Jon's mother again appeared, stating she had trouble getting an attorney. Disposition was reset to May 15, 2012. The court's order stated that the family was to hire an attorney or that Jason Holland would stand in at the disposition hearing. The handwritten docket order noted: *"LAST CONTINUANCE."*

At the May 15 disposition, the trial court considered the Juvenile Sexual Offender Assessment filed by DJJ, removed Jon from his home and ordered him detained until placement, and committed him to DJJ as a juvenile sexual offender for

placement in an "appropriate facility"—despite the fact he had been in the community for nearly a year without any further offenses—rather than ordering treatment in the community. His placement was scheduled to be reviewed in June.

Shortly after entry of this order, a DPA lawyer from Frankfort entered an appearance for Jon and pursued post-judgment motions. Jon's new counsel eventually filed a notice of appeal to circuit court, which affirmed the district court. The Court of Appeals denied discretionary review.

Jon then sought discretionary review from this Court, which was granted for the reasons stated above.

## II. Analysis

▇▇▇▇ The juvenile public-offense process,[5] properly administered, differs dramatically from the adult criminal process, although over the years criminal-case terminology has been imported into the juvenile process because certain criminal law concepts, such as due process and the requirement of proof beyond a reasonable doubt, KRS 610.080(2), are also required by the juvenile code. But a juvenile offense is not a crime. It is instead an allegation of an act committed by a juvenile, "which, if committed by an adult, would be a crime, whether the same is a felony, misdemeanor, or violation." KRS 600.020(47) (2011). Juvenile actions are brought "in the interest of" the juvenile, *id.*, rather than against the juvenile, as occurs in the adult adversarial process. Although the allegations in such juvenile actions mirror all the elements of the crim-

---

5. This is distinguished from the process for resolving a status-offense action, which is "any action brought in the interest of a child who is accused of committing acts, which if committed by an adult, would not be a crime.

Such behavior shall not be considered criminal or delinquent and such children shall be termed status offenders." KRS 600.020(59)(a) (2011).

inal charges that can be made against adults, because of the nature of juvenile actions, there are many procedures and considerations that apply to juveniles that do not apply to adults, and the statutes clearly state that a juvenile offender is *not* a criminal. KRS 635.040.

KRS 600.010(2)(a), although amended by the recent statutory revisions, has always expressed the legislative purposes behind the juvenile code. That provision requires that efforts are to be made to *protect* children; to *strengthen and encourage* family life; to maintain the *biological family unit* ; and to conduct *data collection and research* to support ongoing juvenile practices.

To further support this nurturing mandate, the recently amended KRS 600.010(2)(b) emphasizes a preference for in-home interventions, and avoiding out-of-home placements "to the extent possible." KRS 600.010(2)(d) further stated. at the time of Jon's action (and still states) that children have a "right to treatment reasonably calculated to bring about an improvement of [the] condition" that brought them before the court. And this statute, both before and after the amendment, has mandated fair judicial proceedings which recognize the rights and interests of all parties. KRS 600.010(2)(g).

And while the prior version of KRS 600.010(2) was in effect at the time this case arose, both the general and specific language in the prior statute can certainly be interpreted to subsume the more specific directives of the current version of the statute.

With this broad mandate of protection and rehabilitation in mind, this court must begin by looking at the court process set out in the juvenile code in order to understand whether the process applied in this case was appropriate.

Generally, a juvenile case begins with the filing of a complaint with the Court Designated Worker (CDW). The CDW has several options at that point as set out in KRS 610.030, which will not change until later this year. First, the CDW reviews the complaint, which is actually a pre-court document filed on a prescribed form, to clarify what is being claimed. The complaint is sent to the county attorney who reviews the claim, and determines whether there is probable cause to proceed. KRS 635.010(1). At that point, the CDW has several statutory options, including determining that no further action is necessary and disposing of the complaint; referring the child for social services; or, with agreement of the child, placing the child in a diversion program if he meets certain criteria. KRS 610.030(2)(a) 1.–3. (On successful completion of the diversion, the case is closed and he never goes to court.)

But there are other options that can apply based on the facts and the child's history with the juvenile system. If diversion fails, or if the child does not qualify or rejects diversion, or diversion is otherwise inappropriate, the case may then proceed to a petition (which incorporates the complaint) and which is filed with the clerk of the court, given a case file number, and the case proceeds in court as a juvenile matter. The CDW may recommend informal adjustment or formal court proceedings, or make no recommendation at all. KRS 610.030(2)(a)4.–5.

Once a case is before the court, the court has two options: proceed with formal juvenile court proceedings, or dispose of the case through an informal adjustment. KRS 610.100(3) (replaced by KRS 610.105 effective July 1, 2015). The full processes of formal juvenile court proceedings need not be discussed here, as it is the informal adjustment option that is at issue in this

case, although some parts of formal court proceedings will be noted later to showcase differences in the two approaches to the juvenile case.

An "informal adjustment" is "an *agreement* reached among the parties . . . that the best interest of the child would be served *without formal adjudication and disposition.*" KRS 600.020(34) (emphasis added).[6] The agreement must be made with "consultation, but not the consent, of the victim of the crime," *id.*, and it must be "approved by the court," *id.* To illustrate what this process bypasses, we must look at what "formal" proceedings require.

"Adjudication" and "disposition" are legal terms of art when used in the juvenile code. In formal juvenile proceedings, they are the final steps in concluding a particular juvenile complaint, and the statute requires "two (2) distinct hearings," or a bifurcated proceeding. KRS 610.080.

"The adjudication shall determine the truth or falsity of the allegations in the petition. . . ." KRS 610.080(1). It can amount to an evidentiary hearing on the charge which allows for witnesses and presentation of evidence, or it can be the point at which an "admission" or "confession" is taken and evidence is not presented. KRS 610.080(1). This is not a "guilty plea," though it is frequently referenced as such in common usage, which impermissibly injects criminal connotations. KRS 635.040. Because the adjudication determines the truth or falsity of the petition, it necessarily decides whether a status or public offense has occurred, and if so, what it is.

All hearings are to be conducted "in a formal manner" unless otherwise specified by statute. KRS 610.070(2). These are not hearings open to the public, and only specified persons may be present. KRS 610.070(3). Because a child can be removed from his home and placed with the Cabinet or put in the custody of DJJ, the statute requires due process rights and thus if requested requires application of the Rules of Criminal Procedure, KRS 610.080(2), which also erroneously implies criminality to the juvenile. Any evidence the court relies on must rise to the level of proof beyond a reasonable doubt, also the criminal standard. The Rules of Civil Procedure also apply. *Id.* If the child is found to have committed a public offense, then there are further statutory requirements the court must comply with, such as ordering evaluations to be done by DJJ to assist the court in making disposition. KRS 610.080 (addressing when a "formal predisposition investigation report" must be made); KRS 610.100(1) (addressing content and process of making report).

The disposition is the second hearing required by KRS 610.080. At that hearing, the court "shall determine the action to be taken . . . on behalf of, and in the best interest of, the child." KRS 610.110(1). It provides a child the opportunity to be heard on the information the court is considering, which includes the predisposition investigation report. Disposition can result in several alternatives, including probation, placing the child on court-monitored supervision, or commitment of the child to the Cabinet for Health and Family Services (Cabinet) or to DJJ. KRS 635.060; KRS 610.110(4). Commitment to the Cabinet normally means the child is placed out of the home, in foster care or other Cabinet facilities. Commitment to DJJ usually means the child is

---

**6.** 6 At the time of Jon's proceedings, this definition was under subsection (31) of KRS 600.020. It still reads the same, however.

placed in unsecure or secure detention for a prescribed period of time.

■ But when a court makes a decision to proceed by *informal adjustment*, it is by definition deciding that the case should *not* proceed to formal adjudication and disposition, in the best interest of the child. KRS 600.020(34). This is a significant decision, and as defined and applied, removes the procedural rights and safeguards that accompany formal court proceedings. At the same time, however, it is a finding that *this* child does not need the benefit of formal court proceedings, and that there are alternatives that are *better* for him. And he and the county attorney must *agree*. KRS 600.020(34) provides that an "informal adjustment" (as opposed to a formal court proceeding) requires an agreement reached among the parties to the case. A victim may be consulted about the agreement, but does not have to *consent*. Thus when a court proceeds with an informal adjustment, an agreed-upon resolution to the case occurs rather than an adjudicated disposition.

Obviously, informal adjustment was thus never intended to cover cases where there is a serious offense, or where there is a need for extensive evaluations or corrective out-of-home placements. The intent of the statutes allowing informal adjustments is that the court has discretion to recognize when a case can be resolved best for the child without going through the court process because the child committed a low-level offense or a first, out-of-character offense, or the child's problems may already have been remedied, or the child's family has the situation under proper control.

But even so, informal adjustments are not without certain requirements, and the court's discretion is not unfettered. There must be notice to all parties and the victim, and an agreement between the child and the county attorney to proceed with the terms of an informal adjustment instead of formal juvenile proceedings. Again, this agreement is necessary, because by proceeding with an informal adjustment the child waives many due process rights, such as the right to contest the charges against him. By this agreement, whether the child actually committed the offense or not, he agrees to be subject to the conditions the court then sets as the "adjustment." If the child successfully performs the terms of the informal adjustment, then the case should be dismissed.

But sometimes the child fails to perform whatever conditions the court has set, and that is when many of the questions in this case arise. What can the court require as proper conditions, and what can the court do if the conditions of an informal adjustment are not met?

Applying this legal framework to the case before us, we must begin with looking at the record of the proceedings, which is sparse in comparison to cases originating in circuit court. There is little supporting documentation in the record, but what is available fails to establish why this case was converted from a formal proceeding to an informal adjustment. A recording of the hearing at which the informal adjustment occurred was not included in the appellate record and may not exist. Converting the case is clearly permitted, because an informal adjustment can be made at any time during the proceedings on proper notice to the victim and all interested parties. KRS 610.100(3). And it is implicit in proceeding with an informal adjustment that the court found that it was in the child's best interest to do so. But there is nothing in the record that clearly demonstrates why the court chose this route. Nor is there anything in the record that establishes that the informal adjustment was agreed to by the child.

To the contrary, nothing in the record establishes that the child and his mother wanted him to leave Kentucky and go to live with his father among strangers in another state. Nonetheless, the court proceeded to order the literal banishment of the child from Kentucky, as is noted in the court's entry on the docket sheet. There is no explanation as to why this move was in the child's best interest, nor why this approach was superior to formal proceedings. Worse still, the order itself includes no limit on how long Jon had to live with his father (and thus it had no duration); under what circumstances Jon might be allowed to return to Kentucky, many of which could easily be anticipated; nor any indication of consequences should the child not obey the order.

If the order required Jon to live with his father indefinitely, the district court, in effect, entered a change of custody order without a hearing on the propriety of the father as a custodian, which is not within a district court's jurisdiction. This alone would mean that the court's action fails to meet the statutory requirements for an informal adjustment.

Nevertheless, if the order was of indefinite duration, arguably the child did not satisfactorily perform the ordered informal adjustment, because he returned to the state of Kentucky without permission from the court. But it appears that he returned because of difficulties adjusting to his father's household and because his father was the subject of a dependency and neglect investigation in Oklahoma. The failure to provide for this possibility and thereby leave the child an out if it was impossible or unreasonable for him to continue living with his father, perhaps more than anything, establishes the impropriety of the court's order requiring him to live with his father in another state.

Regardless, once the county attorney learned the child was back in the state, he requested the court to "revoke" the informal adjustment as if it were some kind of pre-adjudication probation, which it is *not*. As the statute makes clear, an informal adjustment is in place of formal proceedings, and it is appropriate only if it is in the child's best interest. But once that route has been invoked, the case does not "revert" to a formal proceeding. The court could have imposed a number of requirements as a part of the informal adjustment, but did not. Failing the one thing ordered, however, does not mean that the court could then proceed on the charges. The path open to the court is to make further adjustments, or to impose sanctions, not to recharacterize the case as one requiring formal adjudication and disposition. If it was not in the child's best interest to go forward with formal court proceedings in the first instance, why would it be in his best interest to do so after he violated the court's order?

At the hearing to "revoke" the informal adjustment, the child's mother attempted to explain to either the prosecutor or the judge as described above why the child had returned. The only response was simply that since Jon was now back in Kentucky, "charges have to come back." Clearly charges were then being reinstated because the child disobeyed the court's order, and not because formal proceedings were in the child's best interest.

An informal adjustment and formal proceedings are alternative routes for dealing with a child charged with a juvenile offense. There is nothing in the statutes that supports a hybrid process. A case is either informally adjusted or it is tried through the formal court proceedings of adjudication and disposition with their attendant due process requirements. Once a child and the other interested parties

have agreed to an informal process where these constitutional safeguards are waived, shifting to a formal process where the child's non-offense conduct during the informal, adjustment is used against him resembles a "bait and switch," and is not legally supportable.

The trial court erred when it changed the case from an informal adjustment to formal proceedings. And while the record on appeal does not clearly establish that the child agreed to an informal adjustment in the first place, the fact is that is what he got, and this Court will presume that orderly and proper procedures were followed in the face, of a silent record. Nonetheless, it is simply unfair to change horses in midstream and formally proceed against him on charges he had every reason to believe were being decided in an alternative manner.

Additionally, there is the factual question as to whether he in fact failed the informal adjustment term. He actually did move to Oklahoma and live with his father for some months, and only returned to Kentucky around five months later. The court's order did not specify how long he was to live with his father, or what the consequences were, if any, for returning to Kentucky.

■ But charges were "brought back" *because the child was back in Kentucky.* Banishment is not a legal disposition under Kentucky law, even as a condition of probation or alternative to imprisonment for adults. *See Weigand v. Commonwealth,* 397 S.W.2d 780, 781 (Ky.1966) ("The Commonwealth concedes it is beyond the power of a court to inflict banishment as an alternative to imprisonment."). A child could, as part of an informal adjustment, agree to live with a different parent, but it is clear that a district court could not enforce such an agreement without the consent of the child's legal custodian, even though a district court may remove a child from his home if the child is at risk of harm, KRS 610.050, and can commit a child to custody after adjudication and disposition. A child can only agree in an informal adjustment to what *he* is willing to do, and to that which is *legal.* Certainly the child's mother, his legal custodian, had rights to be considered in such a move as well, which the district court had no jurisdiction to contravene. Yet the district court re-docketed the charges "as he did not stay in Oklahoma with dad."

The child was placed on "strict" conditions of release, and allowed to remain with his mother. Three months later, apparently an agreement had been negotiated whereby the pending assault charge against the child from the altercation with his mother's ex-boyfriend would be dismissed if the child admitted he had committed sex abuse in the third degree, a misdemeanor. In taking the child's admission or confession, the trial court asked four perfunctory questions, which mostly contained legal terms, and did not explain any of them. The child was asked to admit that he had committed third-degree sex abuse without being told what that meant; he was asked if he had been promised anything for the admission when a child might easily think that he had, because of the agreement to dismiss the assault charge; he was asked if he was under the influence of drugs or alcohol; and whether he was making the admission voluntarily and of his own free will. His answers were barely audible, though he did answer yes to those questions, but as a 15–year–old child, there is nothing in the record to indicate that he understood what he was answering. There was obviously no explanation of the consequences of the admission, which could involve sex-offender treatment in a juvenile detention facility for three years with a possible extension of

one year, which would detain him until age 19. KRS 635.515(1).

After taking the admission or confession, the court then left the child in the community on the same "strict" terms, and set a date for disposition. As noted above, it is unclear whether the child had counsel present when he entered the admission, though it is clear that no counsel spoke up for him. Instead, the judge held a perfunctory hearing at which he stated the "deal" reached on the child's behalf and then asked the four questions laid out above. The child's mother apparently was still seeking other representation for Jon when the disposition was first scheduled. The district judge expressed skepticism that Jon needed a different lawyer at that point, suggesting that a lawyer would only be present for support. The court did delay disposition, but told the child getting a new attorney at that point was futile, because he would not allow him to withdraw his admission. Disposition finally occurred on May 15, 2012, over a year after the case began, contrary to KRS 610.070(1), which requires speedy hearing.

At that time, the trial court removed him from his home, and committed him to DJJ as a juvenile sexual offender. This disposition was available to the court—*if* the child was properly in formal proceedings, and if it was in his best interest. Because the child was adjudicated as having committed a misdemeanor, it was not mandatory that he be committed as a juvenile sexual offender. KRS 635.510(2)(b) 85 635.505(g).

But this child should not have been subjected to formal proceedings. Instead, the court had already found that formal proceedings were not in his best interest, and imposed an informal adjustment. He had been in the community for over a year before disposition. His behavior that was the basis of the charges, while beyond doubt inappropriate, is at least as indicative of immature, adolescent horseplay as it is of sexual perversion. Everything in the record points to the conclusion that this child could have succeeded at an informal adjustment that set the terms based on his conduct and needs rather than expulsion from the state and removal from his home and the custody of his mother. It was error for the court to have ordered otherwise.

■ A juvenile case proceeds by either an informal adjustment or through formal proceedings. Once a case has been determined to be appropriate for an informal adjustment, the case cannot be "returned" to formal proceedings. Electing to proceed by informal adjustment means that there will *not* be formal proceedings on that charge.

The remaining question, then, is what remedy is appropriate in this case. At the very least, the district court's judgment, reflecting the adjudication and disposition, must be vacated. If the child was young enough to still fall under the jurisdiction of the juvenile court, then the appropriate action would be to return the child to the informal adjustment status, so that the court could apply, reasonable and appropriate terms in the child's best interest. However, this child was 15 at the time of the charged offense in 2011, and should be at least 18 years old at this time. His current status is unknown to the Court. If he remains in the custody of DJJ, he must be released forthwith, and now being over the age of 18, his case is concluded.

This, situation highlights the complexity and serious repercussions that arise from juvenile public-offense cases. This child did not receive the process to which he was entitled. For however long he was in the custody of DJJ, the state bore the cost of his incarceration, which was unwarranted. It is wholly unknown what effect this

has had on him and his familial relationships. It is to be hoped that he obtained benefits from sex-offender treatment and other programs at DJJ, but research that sparked juvenile justice reforms nationwide has indicated a negative effect from placing low-level offenders with more serious offenders.

Juvenile dockets are often large, and all courts have time limitations. But there are prescribed processes that must be followed if the courts are to give value to the intent of the legislature in treating juvenile offenders in a manner that is significantly different from adult offenders, yet does not strip them of their basic constitutional rights of fair process.

### III. Conclusion

For the forgoing reasons, the decision of the circuit court is reversed, and the district court's adjudication and disposition in this case is vacated. If the Appellant remains in custody, he is to be released forthwith; and his case closed.

Minton, C.J.; Abramson, Barber and Venters, JJ., concur. Cunningham, J., concurs in result only. Keller, J., not sitting.